## The People ex rel. John S. Estabrook v. Benjamin D. Pritchard, Commissioner of the State Land Office.

*Practice in the Supreme Court: Hearing in mandamus cases: Effect of return.* An applicant for a mandamus, bringing the case to argument upon the respondent's return to the order to show cause, is entitled to the benefit of all the admissions it contains; but he cannot insist upon facts alleged in the petition or the accompanying affidavits, which are not admitted.

*State Land Office: Verbal negotiations for the purchase of land: Payments by drafts received as money by the Commissioner: Who may object.* A person applying at the office of the Commissioner of the State Land Office to purchase primary school land, the price of which was four dollars an acre; on account of which, at the time of such application, he paid two dollars an acre; but was told that he could not have a certificate or patent until the full price was paid; has no right to rely on the verbal assurance of the clerk with whom he transacted the business, that his payment would secure to him the lands, if, on notice, he should secure or pay the balance.

When two persons are contending for priority as applicants for the purchase of primary school lands at the office of the Commissioner, one has no right to object that the payment made by the other was in a draft on New York, it having been received by the Commissioner as money, and it not appearing that it was of less value than currency.

*Heard October 26. Decided January 5.*

Application for Mandamus:

*Longyear & Seager,* for relator.

*John Moore,* for respondent.

COOLEY J.

This is an application for a writ of mandamus to compel the Commissioner of the State Land Office to issue to the relator a patent for certain school lands in the County of Midland.

The relator in this petition states that on the third day of July 1867 he applied at the State Land Office to purchase all of a certain section of school lands, except one forty acre lot, being in all six hundred acres; that he was informed by one Nash, chief clerk and bookkeeper in the office that the said lands would be secured to him on the payment of two dollars per acre; that he paid into said

office the sum of two dollars per acre, being twelve hundred dollars; that his name was written upon the plat of the said lands in the tract books of said office in his presence, and that he was informed by Nash that this entry secured the lands to him, but that he could not procure a certificate or patent until the full amount of the purchase money was paid, as the lands were chiefly valuable for timber, and under a recent ruling of the State Board no certificates or patents were issued on lands of this character until after full payment of the purchase money; that he then stated he would pay the balance remaining due whenever he should be called on, upon the shortest possible notice, but that he had not at that time sufficient funds with him to make full payment; that he was informed that if anything further was required of him he would be notified of the fact by the Commissioner, and that the lands could not be sold to any other person.

The petition further states that at the time of said application, the Commissioner and his deputy were both absent from Lansing; that no communication was received by him from the office until in February 1868, when he went to the office to pay interest and taxes on said lands, or to pay for the same in full if necessary; that the deputy commissioner informed him that neither interest or taxes was due; that he then told the deputy that he was ready to pay in full for the lands, but as he did not intend to lumber on them for one or two years, he should prefer to let the balance of the purchase money remain until then, but that he would on notice, either by mail or telegraph, pay the balance immediately, if the State should require additional security; that the deputy told him it was unnecessary to pay the balance then, and that he would notify him whenever additional security was required; that the land was marked on the office books to him, and that no party could get a claim adverse to his. He further says

that relying upon the assurances of Nash and the deputy, he did not insist upon receiving a certificate or patent, and paying the balance of the purchase money, and that he received no communication relative to said lands, after his last mentioned visit to said office, until the 13th or 14th day of October 1868, when he received a letter from the deputy informing him that other parties had filed an application for a portion of said lands, and that relator was only entitled to three hundred acres; whereupon he immediately went to Lansing, and on October 15th 1868 tendered to the deputy commissioner the balance of the purchase money together with interest, which the deputy received, not admitting his right, but refused to issue a certificate on the ground of a conflicting application, but the Commissioner allowed the relator to select the east half of said section and to receive a certificate therefor, without waiving his right to insist upon a certificate for the balance also.

The petitioner further says that the whole of said lands, as he is advised and believes, were returned by the Commissioner to the County Treasurer of Midland County, prior to said conflicting application, as the lands of the relator, and that the same were assessed to him for the taxes of 1868, and that he is now liable therefor, and upon these facts he prays for the relief before mentioned. Some corroborative affidavits were presented in support of the petition, but they need not be specially mentioned.

The answer of the Commissioner sets forth that it is a rule of his office, established in the winter of 1867, that none of the primary school or other trust fund lands which were principally valuable for the timber thereon, and not for agricultural purposes, should be sold, unless full payment of the purchase money was made at the time, and that his deputies and all his employees have been thoroughly instructed to enforce said ruling strictly; that in the dis--

position of cases which have arisen under said rule, where parties have attempted to purchase lands on part payment, he has adopted the practice of allowing such party the privilege of selecting sufficient of the lands applied for to meet the full amount of the money deposited, at the minimum price, full payment; that sometime in the month of October 1868 his attention was called to an application of Arthur Hill, which was as follows:

" *To the State Deputy Land Commissioner:* Whereas a certain J. S. Estabrook, in July, 1867, did apply for all the primary school land situated in Section 16, Town 16 N., R. 2 E., except the n. w. $\frac{1}{4}$ of n. w. $\frac{1}{4}$.

And whereas, the said Estabrook deposited money only sufficient to cover one-half of the said land applied for by the said Estabrook, at the legal rate of four dollars per acre.

And whereas, the State Land Commissioner ruled that in such cases the party for whom land is reserved is entitled to only so much of the original reservation as his deposit will cover at the rate of four dollars per acre.

Now, therefore, I, Arthur Hill, do hereby apply for all of said land which shall remain after said Estabrook shall have selected the amount to which he is entitled under the ruling of the Commissioner, except the s. e. $\frac{1}{4}$ of s. e. $\frac{1}{4}$, and hereby deposit draft on New York for twelve hundred and eighty dollars, to purchase same.

(Signed)          ARTHUR HILL."

That on examination he found the land mentioned in said application was marked in pencil upon the tract books of the office to said Estabrook, and that he had deposited one-half payment against the same, and had given no additional security; that on learning the condition of the lands he directed his deputy to notify Estabrook at once that he must make a selection of the amount of land he was entitled to under the ruling above mentioned; that on receiv-

19 MICH.—II³.

ing said notice, Estabrook refused to make such selection, and made verbal application to pay for the whole, but did afterwards in January, 1869, announce that the east half of said section was his choice if he could not have the whole, and that the east half was patented to him without prejudice to his supposed rights: that Hill, at different times, applied for a patent of the other half, but though the Commissioner considered him entitled to it, he declined to issue one until the conflicting claims were judicially determined.

To the return of the Commissioner was attached the affidavit of his deputy which is not specially important, except that it states that the twelve hundred dollars deposited by Estabrook was not paid into the treasury but remained in the land office subject to his order ; that he denies that any primary school land is considered as sold or secured to any purchaser until the issue of the certificate or patent therefor, and that he does not admit that he made any such assurances to Estabrook, as the latter states, or that the lands were officially reported for taxation as sold to Estabrook.

The relator has seen fit to bring the case to argument upon the Commissioner's return, and he is of course entitled to the benefit of all the admissions it contains, but cannot insist upon facts alleged in his petition or the accompanying affidavits which are not admitted. We must therefore regard the return of the lands by the Commissioner for taxation, and the assurances by the deputy to Estabrook that they should be kept for him, and that no one could acquire an adverse claim, as facts not established, and which we cannot consider in forming our conclusions.

The disputed facts, however, are not numerous, though they unfortunately present a case upon which it is not very easy to form an opinion which is entirely satisfactory to our own minds. We have no doubt Mr. Estabrook relied fully upon assurances made him by Nash that the lands would all be retained for him, and that if he loses

any part of them now, he will be to some extent a sufferer. Nevertheless we cannot resist the conclusion that he did not understand he had completed a purchase of the land; but rather that he had done sufficient to keep off other purchasers until it should be convenient for him to make payment. He says he was informed the lands " would be *secured* to him ;" that he was informed the entry of his name on the tract book " *secured* the lands to him, but that he could not procure a certificate or patent for said lands until the full amount of the purchase money was paid," and that " the lands could not be sold to any other person." Now all this reads to us very much as if Estabrook was aware of the Commissioner's rule, but thought he might rely on the chief clerk so managing matters as to stand between him and any other purchaser, and as if he knew all the while that the transaction was somewhat irregular, and that he only stood on grounds of favor, and not of strict right. It is remarkable, if he had any different view, that he could suppose himself not entitled to some written evidence of his purchase, or that he could believe that sale to be a legitimate one, upon which the State was allowing him indefinite credit without interest. This is not the mode in which public business is properly conducted, and when a clerk in a public office suffers it to be so done, any man of sound judgment with a proper appreciation of what is correct and legitimate in the dealings between the State and individuals, must be considered as notified that the clerk is exceeding his authority, and undertaking for what he cannot perform. And we do not think the public officer or the State can be held bound by the action of the clerk in such a case.

It is argued, however, that the State by receiving the money from Estabrook in part payment, became bound by the contract of sale, inasmuch as he was bound by his payment, and all contracts must be mutual. But the affidavit of the Deputy Commissioner goes to show that Estabrook's

money was always at his disposal, and certainly if he had such an understanding with the clerk as we have supposed, a contract morally binding upon the State was never effected. If he suffers because the clerk could not protect him as he expected, it is not because he is deprived of a valid purchase, but because he never made one.

Some formal objections are made by the relator to Hill's application. Of these one is that he paid in draft on New-York; but if the Commissioner and the State Treasurer saw fit to receive this, and there is no pretense that it was less in value than the legal currency, we do not think other parties can question their right to do so. Another is that his payment was insufficient to cover the whole purchase he applied for, but this we think is a mistake of fact. Estabrook applied for the whole section except one forty-acre lot on the west half. The Commissioner awards him the east half of the section. Hill applies for all that is not set off to Estabrook, except one forty-acre lot on the east half. As Estabrook took the east half, Hill must take the west half. If he takes the whole there will be 320 acres, which is the amount he paid for. If he excludes the forty-acre lot Estabrook excluded from his application, his payment is more than is needful.

We think the application should be denied, but under the circumstances we will give no costs.

CHRISTIANCY and GRAVES JJ. concurred.

CAMPBELL CH. J.

I think the relator has shown a complete compliance with the statute, and that the rules and the action of the Commissioner were in direct violation of law. The admitted facts show that Hill made his application referring in writing, on the face of it, to the fact that Estabrook had applied for the land, and had paid down half the price, and

that the Commissioner had ruled that in such case the party *for whom the land was reserved*, was only entitled to so much of the original reservation as the money would cover, at four dollars an acre. The return shows inferentially that the Commissioner knew nothing of this particular case till his attention was called to Hill's application, and states that he then wrote to Estabrook requiring him to make his selection of so much land. The application, the payment and the reservation are admitted, and it is not pretended that any opportunity was ever given Estabrook to give security and take the whole, but on the contrary the Commissioner shows he refused either to allow this or to receive full payment, which was made by Estabrook immediately after he received the notice to elect, but which the Commissioner would not admit as lawful payment.

We have then, this state of facts. A party applies to buy school lands and pays half the price. He is informed he cannot receive a certificate or patent until they are paid for, but that the payment will secure the lands, and that if any more is required he will be notified. He deals with the person lawfully in charge of the office, and not only is not informed of any other regulation, but is distinctly informed in effect that he has done all that will be required.

The law under which the case comes up is in these words. " The said Commissioner shall, whenever it satisfactorily appears, that the chief value of any parcel of land consists of pine or any other timber, and that *in his opinion* the interest of the State will not be secured by a compliance with the terms of payment prescribed in the second section of this act, require of the purchaser fifty per centum of the purchase money to be paid at the time of the purchase, and *such security for the payment of the balance of the principal, at any time thereafter, as in his judgment will secure the respective funds against loss*, or he may,

in his discretion, require full payment for the same." *Laws of 1863 p. 165.*

Every purchaser is bound to know what this law permits and what it requires. He knows that the rule laid down is a payment of fifty per cent. and that it depends on the judgment of the Commissioner whether more shall be demanded. He knows also that the Commissioner may or may not require further security according to his own judgment of its importance, and he knows further that the nature and extent of the security are also purely discretionary.

But he is not bound to know that any rule exists which is not brought home to him. No man can be held subject to the caprices of a public officer, and when he deals with him or with his substitute, he has a right to assume that any act not forbidden by the law itself is valid.

In this case he was given to understand that the payment of the money which he made was all that was then required, and he was also informed that the certificate would not be issued until the land was fully paid for. The effect of this was that the State retained in its own hands the entire title to secure half the purchase money—a security which was beyond question adequate—but, whether adequate or not, one which he was thereby given to understand was considered adequate, and which was entirely within the official discretion, which might have dispensed with any security whatever beyond the cash payment.

Moreover the State could not possibly be damnified until the certificate should issue, and enable him to exercise acts of ownership. The law does not require the security to be given at once, nor require the Commissioner to fix it at once; and so long as the cash payment is made, the security must be left to the discretion of the Commissioner, and until he informs the purchaser what he will require, and gives him reasonable time to comply, there can be no default. Here the only notice ever given to relator was a denial of his rights altogether.

This is justified, however, under two alleged rules, one of which is, that cash in full is to be required in every case, and the other, that persons who have made their payment of fifty per cent, shall be confined to an election of so much land as that will pay for in full. Even if made known at the time of purchase, (which was not done here, and which does not seem to be regarded in the office as required) these rules are, both of them, serious violations of law. The second, if made known at the purchase, would be equivalent to the first, and a very absurd variation of it, as every one knows he can buy at any time for cash, and no one would be foolish enough to suppose he gained any rights under such a regulation. But, when not made known at the day of purchase, it is a palpable fraud; and not only a violation of an agreement, but one whereby a party's selection, which may have been the result of expensive exploration, is secured in favor of any one to whom the persons in the office may see fit, from friendship or otherwise, to divulge it.

A practice which furnishes facilities to enable advantage to be taken in this way, is so evidently calculated to encouraged dishonest combinations, at the expense of purchasers who have been actually misled by public agents, to whom they ought to be able to confide in safely, that nothing can possibly justify it. When a public officer has acted within his discretion, he can no more withdraw his action than if it were private dealing. Estabrook gave all that was required of him, and the law authorized a bargain to be made on those terms.

But under this statute, no general rules were admissible. The law will not permit an officer who is bound to act in each case upon its own circumstances, and govern his action by his honest view of it, to declare in advance that he will be of opinion in all cases that the public interest requires full payment, when the law contemplates it may not, and when in fact there may be no reason for it whatever.

Credit is given on public lands in order that the poor as well as the rich may buy them, and it is contrary to the general policy of the statutes to require this credit to be refused unless there is good reason for it. The rule is unlawful on its face, and if it had been permissible to lay it down, it was not binding on the office, but was not only revocable in its nature, but revoked by any contrary action. And no one dealing with the office can know any thing about the secret arrangements with the clerks. It is as necessary in public as in private business to hold the dealings of the person lawfully in charge binding on the government unless they deviate from the law. It is the Commissioner's duty to see that no one is misled by himself or his subordinates, and he is legally as well as honorably bound to guard and not to destroy the rights of those who rely in good faith on their dealings. If he was not satisfied with the security, he should have notified Estabrook to pay or to make it good. The law compels this only when the Commissioner requires it. And Estabrook was not in fault in any way for not doing what he had no reason to suppose was expected of him.

I am also of opinion that under the rule of law repeatedly settled in this State, Estabrook's last payment would have entitled him to the land without reference to the previous transactions. Hill did not pay money, but simply deposited a draft on New York, the case not showing whether it was his own or some one else's. If the Commissioner had a right to keep the application open until there was time to see whether it would be paid, then of course the payment at maturity would remove all difficulty, and, if this question were not settled, I should have no hesitation in regarding this as a reasonable exercise of discretion. But it was held by a majority of the Court in *People ex rel. Parkhurst v. Pritchard, Commissioner, 17 Mich. R., 338,* that this officer had no right to retain lands not ac-

tually paid for, from any one who should apply for them with ready money. It may be that an officer accepting anything but money can be held liable for money. But that does not make the payment to him equivalent to money, and therefore does not protect a party who is bound to know a public officer cannot lawfully sell lands except for money. If his responsibility to the State would answer in one case, it would in another, and then it would make no difference that he received nothing whatever. The State has never authorized him to sell lands and charge them to his account. In *Woodbury v. Lewis, Walker's Ch. R., 256 ; Heald v. Bennett, 1 Doug. R., 513,* and *Welch v. Frost, 1 Mich. R., 30,* it was laid down distinctly that an officer had no right to receive anything but money. The same principle was recognized and applied in *Mumford v. Armstrong, 4 Cowen, 553,* where a Sheriff took a draft and allowed a defendant to go at large before it was paid, and the transaction was held to have been an escape and a new execution was awarded. In *Bank of Orange County v. Wakeman, 1 Cowen R., 46,* the same rule had been applied, the party not being required to look to the Sheriff who had exceeded his powers. And we held in *Elliott v. Miller, 8 Mich. R., 132,* that a tax collector could not lawfully receive a draft on himself for moneys due the public. A private person may be very glad to get a draft from a responsible house, and receive it as money; but nevertheless it is not money, and a public officer, who has no occasion to use exchange in his official capacity, has no right to give the credit or take the risk until its payment. And if any one may lawfully require the Commissioner to sell him lands which have not been paid for, as this Court has held, then there can be no doubt that Estabrook paid for all of these lands before any one else had obtained a legal claim upon them. Upon these facts there is no dis-

pute. The return states expressly that Mr. Estabrook made the full tender and payment at the time and in the manner averred.

For these reasons I think he should have the relief prayed.